## STYLES v. THEO. P. SCOTLAND & CO.

(134 N. W. 708.)

**Certainty as to Christian name in record of mortgage.**

1. "Charlie" is a corruption of "Charles," and the fact that a mortgage is signed "Charlie," instead of "Charles," will not take it out of the chain of title so that a record thereof will not be notice to a subsequent purchaser.

**Homestead — what constitutes.**

2. An intention to devote, and an actual devotion to the use of a home are prerequisites to an estate of homestead. The homestead must be "a home place."

**Mortgage — alteration of date after execution.**

3. An alteration in the date of a mortgage which is made after its execution, but in order to carry out the intention of the parties, will not necessarily invalidate the instrument.

---

Note.—The general rule as to certainty and accuracy necessary in respect to Christian names or initials in a record or index relied on as imparting constructive notice as deduced from the authorities on the subject which are reviewed in a note in 7 L.R.A.(N.S.) 415, seems to be that the record is sufficient if it contains enough to lead the inquirer to the information designed to be imparted by it, and that for this purpose the inquirer's extraneous knowledge, and every fact which inquiry suggested by the record would have led up to, are to be taken into consideration. Later cases on this subject are found in a supplemental note in 25 L.R.A.(N.S.) 1211.

As to what is necessary to constitute a homestead, see note in 102 Am. St. Rep. 389.

As to effect of alteration in date of note to render it invalid, see note in 32 L.R.A. (N.S.) 515.

And the necessity of consideration to sustain ratification of an unauthorized alteration of an instrument is considered in a note in 39 L.R.A.(N.S.) 131.

**Mortgage — alteration of date — ratification.**

  4. A subsequent delivery and acknowledgment of such a mortgage, after such alteration, will amount to a satisfaction of the alteration when the fact of such alteration is apparent upon the face of the instrument.

  Opinion filed January 6, 1912. Rehearing denied February 16, 1912.

Appeal from district court of Pierce county; *Burr,* J.

Action to determine adverse claims to land. Judgment for the defendant. Plaintiff appeals.

Affirmed.

*Styles & Koffel,* for appellant.

*Paul Campbell,* for the respondent.

## Facts.

This appeal comes to us for a trial *de novo* under the so-called Newman law. The form of the action is that of one to determine adverse claims to real estate, and its particular purpose is to have declared void and set aside a certain mortgage made by one Charlie Goodsman to the defendant, Theo. P. Scotland & Co., dated November 24, 1903, and recorded October 22, 1904, for the reasons: "That the said land was, at the date of said instrument, the homestead of said Goodsman, and that his said wife never joined in the execution of said alleged mortgage, and never signed or acknowledged the same, and furthermore, that the said purported mortgage was never signed, delivered, executed, or acknowledged by Charles W. Goodsman at all, and that if the same was given by any person it was without any consideration therefor, and that the same, moreover, was never properly acknowledged so as to entitle it to record; that the plaintiff purchased said land for value, and in good faith, on March 17, 1906, without any knowledge whatever of such alleged and pretended mortgage, and that the plaintiff's grantor, the First State Bank of Maddock, North Dakota, purchased said land in good faith and for value from Charles W. Goodsman and wife before the date said mortgage was recorded (October 22, 1904), and that the plaintiff's said grantor had then and there no notice or knowledge of said pretended mortgage, and that said mortgage is not

within the record chain of title of said land, and was not notice to said bank or to the plaintiff, and is, in fact, a forgery." The answer denies the averments of the complaint as to the homestead, and asserts the genuineness of the mortgage and its priority and proper recording, and prays "that the court find that the defendant has a valid and subsisting lien, to wit, a real estate mortgage upon all of the real estate described in the plaintiff's complaint to secure the payment of $700 and interest, and that said lien is prior to any right, title, or interest in and to said real estate belonging to the plaintiff." The trial court found, among other things, that on or about August 21, 1903, the defendant (Theo. P. Scotland & Co.) sold and delivered to said Charles W. Goodsman a certain threshing machine and other goods, wares, and merchandise, and that, in consideration thereof, said Charles W. Goodsman, by and in the name and style of Charlie Goodsman, executed and delivered to the defendant five promissory notes, dated August 21, 1903, due October 31, 1903, bearing interest at 12 per cent before and after maturity, and amounting in all to $700; "that on August 21, 1903, in consideration of the sale and delivery of the aforesaid goods, wares, and merchandise to him by the said defendant, it was understood and agreed between the said defendant and Charles W. Goodsman that, as security for the purchase price thereof and to secure the payment of the notes given therefor, the said Charles W. Goodsman would execute and cause to be executed and delivered by himself and wife a mortgage upon the premises hereinbefore described (the real estate in controversy); and the said mortgage was, at said time, filled out and drawn, and the date thereof inserted therein August 21, 1903, but that said mortgage was not signed or delivered on August 21, 1903; that thereafter, and on . . . the said Charles W. Goodsman, in the name and style of Charlie Goodsman, signed said mortgage in the presence of two witnesses, and in the presence of Theo. P. Scotland, an officer, and secretary and treasurer of the defendant corporation, and at the time of so signing the said mortgage it was understood and agreed between the parties thereto that the said Charles W. Goodsman should procure said mortgage to be signed, executed, and delivered by Amanda Goodsman, his wife, and that said mortgage was held by the defendant for the purpose of procuring the completion thereof by the execution and delivery thereof by the said Amanda Goodsman, wife of said Charles W. Goodsman; that

the said wife of the said Charles W. Goodsman never signed or exe-
cuted the said mortgage, and the said Charles W. Goodsman never
procured her to sign said mortgage as understood and agreed, or at all,
and that thereafter, on October 5, 1904, in consideration of the afore-
said understanding and agreement, and for a further and additional
consideration of Theo. P. Scotland, as secretary and treasurer of said
defendant, Theo. P. Scotland & Co., executing as surety a certain under-
taking and bond for the purpose of foreclosing a thresher's lien in fa-
vor of said Goodsman and against one Michael Leier, said Charles W.
Goodsman acknowledged the said mortgage and delivered the same to
Scotland, such acknowledgment being acknowledged and taken before
Theo. P. Scotland, secretary and treasurer of the said defendant corpo-
ration, a notary public in and for Pierce county, North Dakota. . . .
That no part of the notes described in and secured by said mortgage
have been paid; that on or about the 18th day of October, 1904, the said
Charles W. Goodsman executed and delivered to the First State Bank
of Maddock, a corporation, a warranty deed of the premises herein, and
that the same was by him duly acknowledged before a notary public
and certified for record on said day, and thereafter, on October 22,
1904, at Marinette, Wisconsin, Amanda Goodsman, his wife, joined in
the execution of said deed, and then and there signed the same, and on
said day duly acknowledged the same, and it was certified for record
before a notary public; and that thereafter, on the 27th day of October,
1904, at 9 o'clock A. M., said warranty deed was filed for record in the
office of the register of deeds of Pierce county, North Dakota. . . .
That thereafter, and on or about the 17th day of March, 1906, the
First State Bank of Maddock executed and delivered to the plaintiff,
Asa J. Styles, herein, a warranty deed, and thereby conveyed, granted,
bargained, and sold to the plaintiff the said premises in fee simple,
which warranty deed was recorded on May 29, 1906; that prior to the
fall of 1902, neither Charles W. Goodsman nor his wife had taken up
their residence upon the premises therein described, or had resided on
the same, and that there was no habitable structure thereon, but the
same was a part of the public domain of the United States of America;
that some time in the fall of 1902, Charles W. Goodsman filed on said
land under and by virtue of the laws of the United States, as a home-
stead, and, pursuant to such filing and alone, took possession and went

upon the said premises and commenced building a dwelling house thereon, which was completed in April, 1903; that prior to July 7, 1903, the wife and family of the said Goodsman had at no time been upon or resided upon the said premises, but that the said wife and family remained and resided at Marinette, Wisconsin, with their parents, that being the home and residence of Charles W. Goodsman and family prior to and at the time he entered upon and filed upon the premises herein, and that the wife and family so remained at Marinette, Wisconsin, under the permission of the land department of the United States, and that if said wife and family were ever upon said premises and actually resided thereon with the said Charles W. Goodsman, it was only for a short period commencing on or about the 7th day of July, 1903, and was only for the purpose of complying with the requirements of the laws of the United States regulating the disposal of public lands by commutation and homestead entries thereon, and not with the intent to make and establish a permanent residence thereon, and to make the same their permanent home; that the said Charles W. Goodsman and his wife and family remained in possession and resided upon the premises respectively from the time of going upon said premises as hereinbefore set forth up to and until the making of final proof and issuance of receiver's receipt to the said Goodsman therefor, on November 4, 1903, at which time they removed therefrom and removed their residence therefrom with the intent to locate, not to return, but to remove to and locate and take up their residence and make their home in the West, and out of the state of North Dakota, the wife and family of the said Goodsman (a child having been born to Mrs. Goodsman during her residence in Wisconsin and during the period of controversy) returning to Marinette, Wisconsin, the prior residence and home of said Goodsman and his family, with their parents and family, where she was on November 18, 1903, and where she remained until the sale of the premises herein to the First State Bank of Maddock, in the fall of 1904, and until she joined the said Goodsman and took up her permanent residence and home at St. John, Oregon, at which point they now reside and have their home; that the said Goodsman, after making final proof and issuance of receiver's receipt to him of the said premises, remained in the state of North Dakota a few days for the purpose of disposing of his personal property, household furnishings, furniture,

etc., some of which he did at that time sell and dispose of; that thereafter and some time during the month of November, 1903, said Goodsman, himself, went West into the states of Oregon and Washington, with the intent to locate and find a home and residence there, and some time thereafter took up his residence at St. John, Oregon, where his wife and family joined him, and where he now has a permanent home and residence; that neither the said Goodsman nor any member of his family, after leaving the state of North Dakota as aforesaid, and after moving their residence from the said premises, returned or took up their residence upon the said premises, except that the said Goodsman some time in the fall of 1904 returned to Pierce county, North Dakota, for the purpose of operating a threshing rig which he did operate, and for that purpose only; that at the time of removing, as aforesaid, it was the intent of the said Goodsman and his wife, Amanda Goodsman, and their family, not to return to or longer reside upon the premises herein, or to make the same their home, but to remove therefrom permanently, and to secure and take up their permanent home and residence elsewhere, and with the intent to dispose and sell the premises herein as soon as a purchaser could be found therefor; . . . That the property herein described was encumbered on April 5, 1904, and prior to the taking effect of § 5054 of the Revised Codes of North Dakota, and of § 5053 of said Codes, and that no declaration of homestead has ever been made or filed or recorded, and that this action was not commenced prior to January 1, 1906, and that this action was not commenced within two years after the execution of the defendant's mortgage, and that the said Charles W. Goodsman, mortgagor and homestead claimant, was not in actual possession of the premises herein described at the commencement of this action." The court also found, as a conclusion of law, and among other things, that the premises in question were at no time the homestead of the said Charles W. Goodsman; that the defense of homestead was barred by § 5054 of the Revised Codes of 1905, and "that the mortgage to the defendant by the said Goodsman is a valid and subsisting lien upon the premises, prior and paramount to any right, interest, or title of the plaintiff," and further adjudged and declared that the plaintiff take nothing by his complaint, and that said complaint be in all things dismissed, and "that the defendant has a lien upon the real property herein set forth and described to secure

the payment of the sum of $700, with interest thereon at the rate of 12 per cent from and after the 21st day of August, 1903, no part of which has been paid, and that the said mortgage is a prior, paramount, valid, and subsisting lien." From this judgment the plaintiff has appealed.

BRUCE, J. (after stating the facts as above). The findings of the trial court as to the question of the homestead and the homestead rights, if any, of the witness Goodsman, are abundantly sustained by the evidence. It is quite clear to us that the defense of homestead is, in this case, barred by the statute of limitations. Rev. Codes 1905, §§ 5053, 5054. See Justice v. Souder, 19 N. D. 613, 125 N. W. 1029. Even if not barred by the statute, the proof falls far short of showing any homestead right or interest. The prerequisites to an estate of homestead are in intention to devote, and an actual devotion, to the use of a home. The homestead must be "a home place." Calmer v. Calmer, 15 N. D. 120, 106 N. W. 684; Brokken v. Baumann, 10 N. D. 455, 88 N. W. 84; McCanna v. Anderson, 6 N. D. 482, 71 N. W. 769; Hoitt v. Webb, 36 N. H. 166. The mere occupancy for the purpose of proving up and getting title to the land is not sufficient, and no conclusive presumption is raised by the acceptance of final proof, by the United States Land Department. Brokken v. Baumann, 10 N. D. 455, 88 N. W. 84. All that the plaintiff's witnesses testified to is that Goodsman filed on the land in 1902, moved onto it in April, 1903, broke and put 20 acres into flax in 1903, and at that time owned no other land. The proofs show that the house and land were practically unoccupied in 1904, and that no crop was put in in 1904. It shows that at the time Goodsman moved onto the land his wife was in poor health, and that they received permission from the land office for her to remain off the land until her health would permit her to move; that she gave birth to a child at the home of her parents, in Wisconsin, on June 15, 1903, and moved onto the land as soon as she recovered from her illness, on July 6, 1903; but it does not show that even after such removal she remained or intended to remain there permanently She herself testifies that she lived there with her husband a short time between then and October 18, 1904, "but was sick a good deal of the time, and spent considerable time with her mother and sister in Wis-

consin." It shows that in August, 1903, Goodsman bought the thresh-
ing machine in question, but that he gave it back the next year; that he
got his final receiver's receipt for commuted proof on November 4,
1903; that he sold the land to the First State Bank of Maddock on
October 18, 1904; that while on the land he built a two-room frame
dwelling and stable, and had a spring partly dug out as a well, but that
his only furniture was an old lamp, a borrowed stove, an old iron bed-
stead, some utensils and a dresser, which latter article he sold soon after
his final proof was made, for two and a half dollars; that he left North
Dakota for Oregon somewhere about November 18, 1903, and did not
return until January, 1904, when he went to Wisconsin, where his
wife was, and, in the fall, came back to thresh (not for himself, but for
others, having no crop himself), and sold the land to the bank in Oc-
tober, 1904; that no declaration of homestead was ever made or re-
corded. Indeed, although both Mr. and Mrs. Goodsman testified that
they looked upon the land as their homestead, it is doubtful whether
they distinguished between a homestead under the laws of the United
States and a homestead under the laws of North Dakota, and their acts
fell far short of proving their intention. See Brokken v. Baumann, 10
N. D. 455, 88 N. W. 84; Calmer v. Calmer, 15 N. D. 120, 106 N. W.
684; McCanna v. Anderson, 6 N. D. 482, 71 N. W. 769; Kuhnert v.
Conrad, 6 N. D. 215, 69 N. W. 185; Justice v. Souder, 19 N. D. 613,
125 N. W. 1029. The signature of the wife therefore was not neces-
sary to the validity of the mortgage.

But was there a valid execution of the mortgage in controversy
by Charles W. Goodsman, and was the same properly acknowledged so
as to be capable of record, and of charging the plaintiff with construc-
tive notice of its existence? The testimony of all of the witnesses, with
the exception of the positive denial of execution made by Charles W.
Goodsman himself, fully bear out the findings of the trial court. It is
true that the date of the mortgage seems to have been changed, and that
the date of November 24th seems to have been written over some other
date. We are inclined to think that such change was made after the
first execution and delivery which, in our opinion, was some time in
November, 1903, and prior to November 24th. This change, however,
was in accordance with the original agreement which is stated by the
witness Scotland, and which, though denied by Charles W. Goodsman,

is abundantly borne out by the other facts and probabilities of the case. The threshing machine, according to the undisputed evidence, was sold on August 21, 1903, and to secure the payment of the notes for the same, Goodsman executed a chattel mortgage. He also, according to Theodore P. Scotland, agreed to execute a real estate mortgage upon the premises in question. That he, at some time, signed that mortgage, there can be no question, for there can be no doubt of the genuineness of his signature. Theo. P. Scotland testifies that at the time the mortgage was agreed to be given, he made it out, but that he did not have the same signed by Goodsman until the 24th day of November, 1903, the execution and delivery of the mortgage being postponed on account of the fact that he was about to make a loan on his land from the Union Central Life Insurance Company, and that neither party desired to interfere with this loan. It was, in fact, agreed, that the mortgage should be a second mortgage. The loan from the Union Central Life Insurance Company was obtained, and was dated November 10, 1903, and filed for record on November 23, 1903. The dating of the mortgage, then, on the 24th day of November, 1903, is certainly in accordance with this original intention, and the facts seem to bear out the testimony of the witness Scotland, though we cannot help but believe that the mortgage was actually executed and delivered prior to November 24th. The testimony of Scotland as to the execution and delivery is corroborated by that of the two witnesses to the mortgage. One of these witnesses was, it is true, the wife of Theo. P. Scotland, but her testimony has every appearance of being honest. She identifies her signature, and testifies that she signed in the presence of Goodsman, but does not remember the exact date. The witness Burkhartsmeier positively identifies his signature, remembers that the mortgage was filled out when he signed it, has no positive means of telling the exact date, says that Goodsman was fixing up a threshing machine at the time and was working around with the threshing machine at the time; that it was in the fall of the year. The testimony is clear that Goodsman was in the vicinity of Rugby between August and November 18, 1903. He testifies, in fact, that he left Devils Lake, North Dakota, about the 18th day of November, 1903, and came straight through to Spokane, Washington, and was in Baker city, Oregon, on the 23d and 24th of November, and did not return to North Dakota until Jan-

uary, 1904. From all of the testimony we cannot but come to the conclusion that the mortgage was properly executed and delivered by Goodsman to the defendant some time in the fall of 1903, and probably in the month of November, 1903, but prior to November 24th; that when originally executed it bore the date of the original agreement and of the notes, namely, August 21, 1903; but that subsequently, and on account of the prior agreement that said mortgage should be subsequent and not prior to the mortgage to the insurance company, the said Theo. P. Scotland, after the signing and witnessing of said mortgage, changed its date to November 24, 1903. This alteration we do not hold to be so material as to invalidate the instrument. No prejudice can be argued. The change was made in order to carry out the agreement of the parties. The mortgage was security merely, and the case is a very different one than it would have been if the dates of the notes themselves had been changed. No change in the real contract of the parties was made. In fact, the change was made in order to make the mortgage conform to the contract. The time of payment and of foreclosure, and of the running of the statute of limitations, was not affected. Elliott, Ev. § 1499; Union Bank v. Cook, 2 Cranch, C. C. 218, Fed. Cas. No. 14,349. But even if the change were material, the subsequent acknowledgment of the mortgage on October 5, 1904, amounted to a re-execution and redelivery of the instrument, and to a ratification of any changes which were made therein. It is true that, after a material alteration, attention must be brought to the same in order that a ratification may be presumed, but in this case the change was so apparent that no one could have read the instrument without seeing it, and the ratification bore the solemn form of an acknowledgment. It is also true that on this question of acknowledgment and redelivery there is a conflict of testimony, and that the witness Goodsman denies that he ever acknowledged the instrument. Scotland, however, who took the acknowledgment, testifies that it was acknowledged and delivered, and that the consideration (for which there was no necessity, see Pelton v. Prescott, 13 Iowa, 567) was the agreement before made, and the additional fact that Scotland should sign Goodsman's bond for the purpose of enabling him to take out a thresher's lien. There is no dispute as to the signing of this bond. There is no doubt that Goodsman was in the neighborhood of Rugby on the date

in question.    The notary's certificate, too, should have some weight. On the whole we do not feel justified in overruling the findings of the trial court that the mortgage was redelivered on October 5, 1904, and that it was properly acknowledged so as to entitle it to record.

We cannot see any force in the contention of appellant in regard to the size of the seal.    We believe, from the evidence and the exhibit, that the seal substantially met the requirements of the statute in regard to size, and was substantially 1⅝ inches in diameter.    The doctrine of *de minimis non curat lex* would seem to apply to physical facts as well as to money values.

Nor do we think there is any force in the contention that on account of the fact that the mortgage was signed Charlie, and not Charles W., it was taken out of the chain of title, and that the recording of it was not legal notice to the respondent.    There can be no doubt, from the evidence, that Charles W. Goodsman was both known as Charlie and as Charles.    The notes to the commission mortgages which were given to Wesley Styles, an officer of the First State Bank of Maddock at the time the mortgage to the Union Central Life Insurance Company was made, were signed Charlie Goodsman, and the same is true of the chattel mortgage upon the threshing machine, in evidence.    In the case of Woodward v. McCollum, 16 N. D. 42, 111 N. W. 623, a mortgage signed Harry S., when the title was in Henry S., was held sufficient.    Harry was held to be a corruption of Henry.    There can be no doubt that Charlie is a corruption of Charles.

Neither did the court err in finding that the mortgage was unpaid and the amount due under it.    This is a statutory action to determine adverse claims.    It was certainly proper to ascertain the amount and the nature of the lien.    Not only did the plaintiff, in his complaint, ask to have the nature of the adverse claims fully disclosed, but the defendant, in his answer, specifically prayed that his rights under the mortgage might be adjudicated.

The judgment of the District Court is affirmed.